**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES** | **CRIMINAL ACTION** |
| **v.** | |
| **GARRICK KIRK** | **NO. 25-517** |

# MEMORANDUM

**HODGE, J.** **November 6, 2026**

## I. INTRODUCTION

Defendant Garrick Kirk ("Mr. Kirk") is charged with one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Before the Court is Mr. Kirk's Motion to Suppress Physical Evidence and Post-Arrest Statements (ECF No. 20 (the "Motion")) and the Government's opposition thereto (ECF No. 21). Mr. Kirk argues that the firearm and ammunition seized during a pedestrian stop should be suppressed because they were obtained during an unlawful search and seizure and that his post-detention statements must also be suppressed as fruit of the poisonous tree.

The Court held an evidentiary hearing on the Motion on October 7, 2026. (ECF No. 26.) During the hearing, Amtrak Police Officer Kevin Haelle ("Officer Haelle") testified and all Government exhibits were admitted into evidence, including Officer Haelle's body-worn camera footage (Gov. Ex. 1 ("BWC")), photographs of the seized firearm (Gov. Ex. 2), Officer Haelle's Investigation Interview Record (Gov. Ex. 3), the Philadelphia Police Department ("PPD") Incident Report (Gov. Ex. 4 (the "PPD Incident Report")), the PPD Domestic Violence Report (Gov. Ex. 6 (the "DV Report")), and the Amtrak Incident Report (Gov. Ex. 7 ("Amtrak Incident Report")).

For the reasons stated below, the Court finds that the officers did not possess the requisite reasonable articulable suspicion to stop and frisk Mr. Kirk, and therefore grants the Motion.

## II. BACKGROUND

### A. Factual Background[1]

On June 4, 2025, at approximately 1:44 p.m., Amtrak Police Officers Kevin Haelle, Marty Devinney, and Alex Caban were on patrol at the William H. Gray III 30th Street Station ("30th St. Station") in Philadelphia, Pennsylvania. (ECF No. 20 at 2; Tr. 12:3–14, 21:7–9.)[2] While on patrol, the officers received a radio call reporting a domestic disturbance on the SEPTA platform. (ECF No. 20 at 2; Tr. 12:19–26.) SEPTA security officers described the male involved in the disturbance as a "Black male who was wearing a red shirt and tan pants." (ECF No. 20 at 2–3; *see* Tr. 13:14–19.) Officer Haelle and his colleagues encountered an individual matching this description on Track 3 of the SEPTA platform, who was later identified as Mr. Kirk. (ECF No. 20 at 3; Tr. 14:14–16.) By the time that Officer Haelle and his fellow officers arrived at the SEPTA platform, the verbal altercation between Mr. Kirk and his wife ("Mrs. Kirk") had ended, and Mr. Kirk was on the SEPTA platform while Mrs. Kirk was downstairs in the SEPTA station area. (*See* Tr. 15:3–16; ECF No. 20 at 3.)

Officer Haelle and his colleagues spoke with Mr. Kirk while other officers interviewed Mrs. Kirk. (ECF No. 20 at 3; Tr. 17:17–25.) At this time, Mr. Kirk answered questions posed by Officer Haelle regarding the alleged domestic dispute. (ECF No. 20 at 3; Tr. 16:2–4.) According to Mr. Kirk, the dispute began when another female passenger greeted him on the platform, which angered Mrs. Kirk. (ECF No. 20 at 3; Tr. 16:8–10.) Mr. Kirk denied any physical altercation with

---

1 The Court adopts the pagination supplied by the CM/ECF docketing system.

2 Citations to "Tr." refer to the Transcript of the Motion hearing held on October 7, 2026. (ECF No. 27.)

his wife and stated that he had taken her phone to try to solicit help from his mother-in-law. (BWC at 1:25–1:34 ("I didn't touch her. I didn't do nothing. I took her phone so I could make a phone call to her mom and I gave her her phone back.").) Mr. Kirk stated that he returned the phone to Mrs. Kirk after the call was completed. (*Id.*; Tr. 19:7–8.)

While speaking with Officer Haelle, Mr. Kirk appeared frustrated with the situation and paced back and forth on the platform. (*See* ECF No. 20 at 4; BWC at 3:09–3:11, 4:00–4:15, 4:27–4:36, 4:42–5:36.) Officer Haelle asserts that Mr. Kirk's pacing and "blading"[3] his body in an attempt to obscure the officer's view of his right front pants pocket. (ECF No. 20 at 4; *see also* ECF No. 21 at 3; Tr. 18:1–12.) During his discussion with officers, Mr. Kirk attempted to retrieve items from his right front pants pocket to demonstrate that he did not have his wallet. (ECF No. 20 at 4; ECF No. 21 at 4; BWC at 4:14–4:28.) Mr. Kirk also informed officers that he had a probation appointment the following day. (BWC at 5:04–5:10.) According to Officer Haelle, it was at this time that he observed an "L-shape[d] bulge in [Mr.] Kirk's right pants pocket that he recognized, based on his experience, to be the outline of a firearm." (ECF No. 21 at 4; *see also* ECF No. 20 at 4; Tr. 35:20–36:6.) Officer Haelle then detained and handcuffed Mr. Kirk before searching Mr. Kirk's person, at which time he recovered a firearm.[4] (ECF No. 20 at 4; ECF No. 21 at 4; BWC at 5:54–6:15.) Mr. Kirk immediately informed Officer Haelle that the firearm was not his and that he had found it on his way to the train station. (ECF No. 20 at 20; ECF No. 21 at 4.) Specifically, Mr. Kirk stated: "That shit ain't even mine!" (ECF No. 21 at 4; BWC at 6:29–6:30); and "I don't own any weapons, I found this, it's a .380. I live right down the street from

[3] "Blading" is a unique term used and defined by the Officer based on the Defendant's gait.

[4] The recovered firearm is a black Glock Model 42 .380 caliber handgun, with both serial numbers obliterated. (ECF No. 21 at 4.) The firearm was loaded with one round of ammunition in the chamber and five in the magazine. (*Id.*)

Kensington, you know how many guns you're gonna find over there!" (ECF No. 21 at 4; BWC at 6:38–6:47).

After Mr. Kirk was handcuffed and transported to the Septa holding cell (*see* Tr. 27:22), Officer Haelle asked if Mr. Kirk possessed a permit for the firearm at issue. (ECF No. 20 at 5; Tr. 59:21–24; BWC at 11:24–11:31.) Mr. Kirk replied that he did not have a permit, and again asserted that the weapon was not his. (BWC at 11:31–36.)

### B. Procedural History

On December 9, 2025, a grand jury sitting in the Eastern District of Pennsylvania returned a one-count indictment charging Mr. Kirk with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) On May 19, 2026, Mr. Kirk filed the instant Motion seeking to suppress the recovered firearm and Mr. Kirk's post-arrest statements that the Government intends to introduce at trial. (ECF No. 20.) The Government filed its response in opposition on July 23, 2026. (ECF No. 21.) On October 7, 2026, this Court held a hearing on the Motion and admitted all Government exhibits into evidence. (ECF No. 26; Tr. 84:6–9.) The Motion is now ripe for disposition.

## III. LEGAL STANDARD

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. Evidence discovered during an unreasonable search or seizure may be considered "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 484–85, 488 (1963). With certain exceptions, warrantless seizures are generally considered unlawful. *See United States v. Brown,* 448 F.3d 239, 244 (3d Cir. 2006). Under the exception recognized in *Terry v. Ohio*, 392 U.S. 1 (1968), however, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that

criminal activity is afoot." *Brown*, 448 at 244 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Evidence obtained in a "*Terry* stop" that does not meet the requirements of the exception is suppressed as fruit of the poisonous tree. *Id.* (quoting *Wong Sun*, 371 U.S. at 487–88). A defendant may move to suppress evidence pursuant to Rule 41(h) of the Federal Rules of Criminal Procedure. Once a defendant has established a basis for his motion to suppress, the burden is on the government to show that the search or seizure was reasonable. See *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

## IV. DISCUSSION

Mr. Kirk argues that Officer Haelle did not have specific and articulable facts to support reasonable suspicion that he had committed a crime at the time that he was seized. (ECF No. 20 at 11.) Mr. Kirk further contends that, even if the stop had been justified, the search of his person was not. (*Id.*) In response, the Government argues that Officer Haelle seized Mr. Kirk only after he developed reasonable suspicion to believe that Mr. Kirk was engaged in criminal activity and that Mr. Kirk was armed and dangerous. (ECF No. 21 at 6.) The Government avers that Officer Haelle's reasonable suspicion was based on his observation of a bulge in Mr. Kirk's pants pocket that he recognized, based on his experience, to be the outline of a firearm. (*Id.*)

### A. The Moment of Seizure

The Fourth Amendment becomes relevant at the moment a defendant is seized. *See Brown,* 448 F.3d at 245 (quoting *Terry*, 392 U.S. at 16); *see also United States v. Amos*, 88 F. 4th 446, 451 (3d Cir. 2023) ("Reasonable suspicion is evaluated at the moment of a seizure, so the first step in a suppression analysis is to determine when the seizure occurred."). A seizure occurs when there is "a laying on of hands or application of physical force to restrain movement" or a "submission to 'a show of authority.'" *Brown*, 448 F.3d at 245 (citing *California v. Hodari D.*, 499 U.S. 621,

626 (1991)). Here, the Government asserts that a seizure occurred when Officer Haelle grabbed Mr. Kirk's arm to detain him. (ECF No. 21 at 6.) The Government further contends that Mr. Kirk was free to exit the interaction prior to the point when Officer Haelle asserts that he saw the bulge in Mr. Kirk's pocket. (Tr. 98:22–99:2.) Mr. Kirk does not argue that the seizure occurred any earlier than this point. The Court notes that before Officer Haelle exercised physical control over Mr. Kirk, Mr. Kirk walked freely on the train platform while speaking with the officers. (*See generally* BWC at 0:43–5:54.) Based on these facts, the Court finds that the seizure occurred when Officer Haelle took hold of Mr. Kirk on the SEPTA platform, and proceeds with the Fourth Amendment analysis accordingly.

**B. Reasonable Suspicion**

As recognized in *Terry*, a "stop and frisk" by a police officer is "constitutionally permissible if two conditions are met. First, the investigatory stop must be lawful. Second to proceed from a stop to a frisk, the police officer must reasonably suspect that the person is armed and dangerous." *See United States v. Augustus*, 590 F. Supp. 3d 767, 777–78 (E.D. Pa. 2022) (citation modified) (citing *Terry*, 392 U.S. 1). Reasonable suspicion to conduct a *Terry* stop must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Reasonable suspicion is assessed by considering "the totality of the circumstances, including the police officer's knowledge, experience, and common sense judgments about human behavior." *United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012) (citing *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)).

The Court finds that the Government has failed to demonstrate that the officers had reasonable, articulable suspicion that Mr. Kirk was engaged in criminal activity prior to his seizure.

When determining whether reasonable suspicion existed, a court must consider the totality of circumstances, including whether the suspect was in a high-crime area, the time of day, the suspect's behavior, and the officer's specialized knowledge. *See Brown*, 448 F.3d 246–47 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *United States v. Hester*, 910 F.3d 78, 87 (3d Cir. 2018)). "Facts known to an officer at the time of a *Terry* stop must bear individual significance if they are to be considered in the aggregate." *United States v. Lewis*, 672 F.3d 232, 240 (3d Cir. 2012) (citing *United States v. Mathurin*, 561 F.3d 170, 174–75 (3d Cir. 2009)); *see also Mathurin*, 561 F.3d at 174–75 ("We will examine the factors separately to address their individual significance, and then in the aggregate to assess the agents' reasonable suspicion under our totality of the circumstances inquiry.").

The Government presents the following as factors that combined to form the totality of circumstances giving rise to reasonable suspicion: (1) officers received a radio call that an individual matching Mr. Kirk's description was involved in a domestic disturbance with a female passenger and Mr. Kirk confirmed he had a verbal altercation with his wife, (2) Mr. Kirk repeatedly "bladed" his body away from officers, (3) Mr. Kirk appeared agitated, and (4) Officer Haelle observed an L-shaped bulge in Mr. Kirk's right pants pocket. (ECF No. 21 at 9–10; Tr. 18:3–8.)

Here, officers encountered Mr. Kirk in the early afternoon on a train platform in Philadelphia's 30th St. Station. The Government does not claim this is a high-crime area. While Officer Haelle and others initially approached Mr. Kirk in response to a radio call indicating that Mr. Kirk was involved in a domestic dispute, officers did not obtain any evidence prior to the seizure that suggested that Mr. Kirk had physically harmed his wife or that anything more than an argument took place between Mr. Kirk and his wife. (*See* Tr. 54:1–19, 65:17–25.) The DV Report that Officer Haelle completed after Mr. Kirk was taken into custody confirms that the incident was

treated as a "VERBAL DISPUTE ONLY" and notes that there was "[n]o fight just verbal altercation." (Gov. Ex. 6 at 1–2.) The PPD Incident Report similarly states that "upon [officers'] arrival there was no fight just verbal altercation." (Gov. Ex. 4.) Mr. Kirk also appeared agitated and expressed irritation with the apparently repetitive arguments he had with his wife regarding accusations of infidelity. (*See* Tr. 76:15–23; BWC at 1:17–19 ("I want her to leave me alone. She do this shit to me every day.").) Taken together, these factors do not suggest or support a reasonable suspicion of criminal activity.

The Court does not find credible Officer Haelle's testimony that his reasonable suspicion of criminal activity was informed by Mr. Kirk "blading" his body, as Officer Haelle describes the manner of Mr. Kirk's walking and movement, away from the officers. (*See* Tr. 18:7–8 (explaining that blading means Mr. Kirk was "turning his body away from facing [Officer Haelle]" such that "[officers were] unable to fully get a look at him").) Officer Halle testified that he had served in law enforcement in various jurisdictions for 14 years. Officer Haelle stated that his interpretation of events involving Mr. Kirk was informed by his participation in approximately ten Violation of the Uniform Firearms Act ("VUFA"), 18 Pa. C.S. § 6101 *et seq.*, arrests during the course of his career as a law enforcement officer, only three of which involved similar circumstances where the firearm was not visible to the officer but apparent based on the shape of the weapon. (Tr. 69:21–70:19.) Officer Haelle testified that his observation of Mr. Kirk's blading also factored into his thought process as to whether to detain Mr. Kirk. (Tr. 72:6–8.) Officer Haelle identified several instances in the BWC footage that he characterized as blading due to the "turn of the hip back away" from officers. (*See, e.g.*, Tr. 73:5–24 (referring to BWC at 2:35), 75:8–3:14 (referring to BWC at 3:14).) However, Officer Haelle also testified that he did not identify this activity as blading until *after* he learned that Mr. Kirk had a weapon:

> Q. But you don't know there's a gun there --
> A. The hips are.
> Q. -- so what makes it blading without the knowledge of a gun?
> A. Just him trying to keep his -- where the gun is away from where I could see him visually. See him in front.
> Q. But again, you don't know the gun is there. So, what makes it blading? Is the knowledge of the gun then when you deduce it's blading? Or would you find out later?
> A. What I find out later.
> Q. Okay. So, at that point, you don't identify his conduct as blading until after you determined that he has a weapon on him, correct?
> A. That's correct.
> Q. And then you go back and you look at your video, and you look at the body-worn camera footage. And you're like, oh, at that point, he was blading. He was trying to keep his right side away from me --
> A. Yes.
> . . .
> **Q. And so this activity that you have described as blading, you did not identify it as blading until after you seized the weapon, correct?**
> **A. That's correct.**

(Tr. 75:15–76:7, 77:14–17 (emphasis added).) The reasonableness of an officer's suspicion is determined by what he knew in real time, not in retrospect. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."). The Court therefore does not consider Officer Haelle's observation of the alleged blading to the extent that it is based on his post-search knowledge.

Thus, the primary factor that the Government presents in support of reasonable, articulable suspicion is Officer Haelle's assertion that he observed "a bulge in [Mr. Kirk's] front right pocket in the shape of an L."[5] (*See* Tr. 23:23–24:1.) The Court finds this unpersuasive for two reasons.

First, Officer Haelle had no knowledge that Mr. Kirk did not have a permit to carry a firearm or was otherwise prohibited from carrying a firearm prior to seizing Mr. Kirk. "Suspicion

[5] While the Government's brief states that Mr. Kirk "repeatedly grabbed at his noticeably bulging right pants pocket (ECF No. 21 at 9), this assertion was not repeated in the Motion hearing and is not supported by the BWC footage. The Court therefore does not consider this to be a factor supporting reasonable suspicion.

that a person is armed, without incorporating consideration of the legality of the suspected gun possession, does not satisfy *Terry*." *United States v. Witherspoon*, No. 26-cr-147, 2026 WL 2583151, at *4 (E.D. Pa. Sept. 1, 2026); *see New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 10 (2022) (holding that the Second and Fourteenth Amendments protect an individual's right to publicly carry handguns for their self-defense). This is particularly true in Pennsylvania, where it is not unlawful to carry a concealed firearm in public. *Commonwealth v. Hicks*, 208 A.3d 916, 937 (Pa. 2019) (explaining that absent an officer's prior knowledge that an individual is not permitted to carry a concealed firearm or any articulable facts supporting reasonable suspicion that a firearm is being used or intended to be used in a crime, an officer may not conclude that there is criminal activity based on mere possession of a firearm); *see also Lewis*, 672 F.3d at 240 (finding that there was no reasonable suspicion based solely on possession of a firearm where the governing law allowed licensed individuals to carry concealed firearms). As explained in the Motion hearing and reflected in the BWC footage, Officer Haelle did not have knowledge that Mr. Kirk was not authorized to carry a firearm in Pennsylvania prior to the seizure. (*See* Tr. 58:25–59:10 (confirming that officers were aware only that Mr. Kirk was on probation prior to the seizure, which, unlike parole, does not create a presumption of a prior felony conviction), 59:15–17 ("Q. But you, during this interaction, at no point, ask him if he has a permit to carry a weapon, right? A. That's correct.").) The record also does not suggest that the radio call that the officers received indicated that a firearm had been observed in relation to the verbal altercation between Mr. Kirk and his wife.

Second, the cases that the Government cites indicate that reasonable suspicion requires more than a mere assertion that a bulge was observed and a hunch that the bulge is a gun. In *Spears v. Leporace*, the Third Circuit found that facts supported reasonable suspicion where an officer

with seventeen years of experience (twelve of which were in the vice division) was investigating drug dealing in a high-crime area and observed the suspect adjusting something in his waistband. 449 F. App'x 187, 189–90 (3d Cir. 2011). Likewise, in *United States v. Samuels*, the court affirmed the denial of a motion to suppress where officers responding to a tip of a man with a gun encountered the defendant in a high-crime area with a "bulge around the waist," and the defendant acted nervous while being questioned by the officers and refused to comply with officers' demands to put his hands up. 131 F. App'x 859, 860–861 (3d Cir. 2005). In *Savage v. Lederer*, the court determined that officers had reasonable suspicion to stop an individual where the officers were patrolling a high-crime area, observed the individual with a "noticeable bulge around his front waist area" and, when asked about the bulge, the individual "responded defensively and claimed that the bulge was his belt." No. 19-cv-1114, 2024 WL 1936235, at *5 (E.D. Pa. May 1, 2024). The Government also cites *United States v. Carstarphen*, but in that case the Third Circuit only briefly noted the observation of a bulge in the context of reasonable suspicion to frisk a suspect. 298 F. App'x 151, 157 (3d Cir. 2008). The Court had already concluded that officers had reasonable suspicion to initiate the stop based on a reliable tip that several men were fighting in a high-crime area, and that one of the men had a firearm. *Id.* at 153.

Here the credible facts show only that Officer Haelle believed that Mr. Kirk appeared agitated and observed a bulge in Mr. Kirk's pants pocket. Officers lacked any knowledge from which they could be said to suspect that the firearm was carried illegally. The Court concludes that in these circumstances, the officers have not shown reasonable suspicion of criminal activity that justifies a seizure under *Terry*. Furthermore, the facts do not suggest that Officer Haelle actually believed Mr. Kirk to be armed and dangerous. Officer Haelle testified that, prior to seizing Mr. Kirk, he did not feel threatened during the five-minute interaction he had with Mr. Kirk, nor did

he believe Mr. Kirk to be a threat to anyone on the platform. (Tr. 63:4–15.) Additionally, Officer Haelle did not testify that Mr. Kirk engaged in any specific action that led him to fear for himself or others, such as reaching for the weapon or turning to flee with it. In fact, Officer Haelle testified that even after identifying the bulge in Mr. Kirk's pants pocket, the officers did not immediately take Mr. Kirk into custody because they were still investigating the nature of the domestic dispute. (*See* Tr. 37:18–38:6 ("Q. But you didn't immediately grab him, correct? A. That's correct. Q. You wait a period of time. Why did you do that, Officer Haley [sic]? A. Because we were still waiting to see if there was any injuries to the wife or anything[.]").)The Court expects that if officers actually believed Mr. Kirk presented a danger to themselves and others on the platform, they would have acted quickly to mitigate that threat. That they did not do so runs counter to the Government's current assertion that the officers believed Mr. Kirk to be dangerous.

Given the above, the Court finds that the Government has failed to demonstrate that the officers had reasonable suspicion to stop and frisk Mr. Kirk.

## V. CONCLUSION

Based on the above, the Court grants the Motion and suppresses all evidence derived from the unlawful search, including Mr. Kirk's post-detention statements.[6]

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**

[6] *See Murray v. United States*, 487 U.S. 533, 536–37 (1988) (explaining that the exclusionary rule prohibits the introduction of evidence seized during an unlawful search and derivative evidence acquired incident to the unlawful search "up to the point at which the connection with the unlawful search becomes 'so [attenuated] as to dissipate the taint'").